UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

VINCENT RICCIARDI,[1]

                    Plaintiff,

        - against -

METROPOLITAN LIFE INSURANCE
COMPANY, *et al.*,

                   Defendants.

-------------------------------------------------x

USBC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/15/19

16-CV-3805 (CM)

**OPINION**

McMahon, C.J.:

Plaintiff Vincent Ricciardi[1] brought this action against Defendants Metropolitan Life

Insurance Company ("MetLife"), Morgan Stanley Disability Plan, and Morgan Stanley & Co.,

LLC ("Morgan Stanley") (collectively "Defendants"), challenging their disability benefits

calculation pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001 *et seq.* (Compl., Dkt. No. 1.)

Before this Court is Defendants' Motion for Summary Judgment seeking dismissal of

Ricciardi's claim. (Dkt. No. 23.) For the reasons discussed below, Defendants' motion is

DENIED, and the case is remanded to MetLife.

---

[1] Although Plaintiff's name was incorrectly pleaded as "Ricchiardi," the Court will refer to Plaintiff using his correct
name, Ricciardi, throughout this opinion. I have amended the caption as well.

1

# FACTS

## I. The Plan Benefits

Ricciardi is a licensed stock broker. He was employed as a financial advisor by Morgan Stanley beginning in December 2011. (Compl. ¶ 4, Dkt. No. 1.) As part of his employment package, Ricciardi was a participant in Morgan Stanley's Disability Plan (the "Plan"). (Rule 56.1 Statement of Uncontested Material Facts on Behalf of Defs. Metropolitan Life Insurance Company, the Morgan Stanley Disability Plan and Morgan Stanley & Co., LLC ("Defs.' 56.1") ¶¶ 1,3, Dkt. No. 21.)

The Plan is administered by MetLife. (Aff. of Cynthia Broadwater in Supp. of Defs.' Mot. for Summ. J. ("Broadwater Aff."), No. 23, Ex. A at SPD-000121.[2]) The Plan covers short-term disabilities ("STD") and long-term disabilities ("LTD").

STD benefits are provided by Morgan Stanley. (*Id.* at SPD-000121.) STD benefits consist of the "continue[d] base salary or a portion of [the employee's] commissions or incentive compensation for up to 26 weeks." (*Id.*) MetLife is responsible for determining whether an employee is entitled to STD benefits. (*Id.* at SPD-000122.) However, Morgan Stanley makes all STD payments directly to the employee. (*Id.* at SPD-000123.)

LTD coverage is insured and provided by MetLife. (*Id.* at SPD-000126.) MetLife also determines eligibility for LTD benefits. (*Id.* at SPD-000127.) The Plan's LTD benefits "protect 60 percent of [the employee's] Benefits Eligible Earnings, up to a maximum benefit of $25,000 per month for disabilities." (*Id.* at SPD-000125.) Disabilities due primarily to mental illness are covered for a maximum period of up to 24 months. (*Id.*)

---

[2] For citations to the Broadwater Affidavit, the Court has removed the "MET/RICCIARDI" text for efficiency.

LTD benefits are calculated by taking "60 percent of [the employee's] Benefits Eligible Earnings in effect at the first date of disability offset by Other Income Benefit." (*Id.* at SPD-000126; *see also id.* at COI-00025.)

"Benefits Eligible Earnings" ("BEE"), the critical value for our purposes, are calculated at the employee's hire date and then recalculated annually every fall prior to the annual enrollment process ("annual enrollment"). They consist of the *higher* of "(1) Annualized base pay upon hire or prior to annual enrollment, or (2) [the] prior calendar year's Eligible Pay, which is [the employee's] *actual earnings*, including deferred compensation awards in the year paid, less certain other amounts." (*Id.* at SPD-000011; *see also id.* at COI-00029–30.)

Eligible Pay is "*generally*, [the employee's] prior year's Form W-2 earnings." (*Id.* at SPD-000011 (emphasis added).) Eligible Pay is "the employee's annual gross salary from Morgan Stanley reflected in [the employee's] Form W-2, less any amounts not related to performance (such as taxable relocation expenses)." (*Id.*) Eligible Pay "includes, but is not limited to: base pay; most bonus payments; incentive compensation; commissions; cash performance awards; overtime; and premium pay," amongst other things. (*Id.*; *see also id.* at COI-000028–29.) "Eligible Pay does not include: amounts payable as referral fees, relocation expenses; amounts paid prior to your start date (except prior employer W-2 pay); and certain bonuses to satisfy a loan," amongst other things. (*Id.* at SPD-000011 (emphasis added); *see also id.* at COI-000029.)

"Other Income Benefits" are defined as "benefits paid to [the employee] separately from [the] LTD benefit" including "income received as a result of the same disability and inability to work for which you are claiming benefits under the disability plan," such as worker's compensation or other disability benefits. (*Id.* at SPD-000127.)

3

MetLife is the "Claim Reviewer" and "Appeal Reviewer" for both STD and LTD benefits claims and appeals. (*Id.* at SPD-000159.) According to the Plan, Reviewers, including MetLife, have "discretionary authority to interpret and make determinations under the Plans." The Plan explains, "Any decision made will be effective unless the review is found to be arbitrary or capricious." (*Id.* at SPD-000163.)

## II. The Determination of Ricciardi's LTD Benefits

Ricciardi was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder during a psychiatric evaluation in May 2014. (*Id.* at CF-000101.) He experienced "significant symptoms" of depression and anxiety, and was placed on a range of medications to treat these conditions. (*Id.*)

On or around June 4, 2014, Ricciardi contacted MetLife and asked for a leave of absence from Morgan Stanley, effective May 30, 2014. (Defs.' 56. 1 at ¶ 11.) He also asked for STD benefits, as he was disabled from his job as a financial advisor. (*Id*; Broadwater Aff. Ex. C at CF-000411.)

MetLife approved his request, and Ricciardi received STD benefits through November 26, 2014, which was the maximum benefit period under the Plan. (Defs.' 56.1 at ¶ 11; Broadwater Aff. Ex. C at CF-000342.)

On or around October 2014, MetLife began to prepare to transition Ricciardi from STD benefits to LTD benefits. As part of this process, MetLife contacted Morgan Stanley to ascertain the specifics of Ricciardi's coverage. (Broadwater Aff. Ex. C at CF-000762–763). Morgan Stanley advised MetLife that Ricciardi's "[BEE] in effect just prior to the date of [the] disability adjusted on the first anniversary of benefit payments and each following anniversary" was $34,527.20. (*Id.* at CF-000764.)

4

The record reveals that Morgan Stanley sent or otherwise conveyed to MetLife the Plan's language regarding the formula used to calculate BEE, (*id.* at CF-000764-767), but there is absolutely no indication in the record that Morgan Stanley explained to MetLife the information and procedures it used to determine the $34,527.20 number, such as what Ricciardi's base salary was, what his W-2 earnings were, what deductions were appropriately made from those earnings, and how it arrived at the Eligible Pay number that it had to compare to his base salary per the formula in the Plan. The record also does not indicate that anyone from MetLife asked Morgan Stanley to justify its conclusion that Ricciardi's BEE was $34,527.20 – an especially odd fact, since Morgan Stanley informed MetLife that Ricciardi's salary included "commission and/or bonus or other type of pay." (*Id.*)

MetLife conducted a "Benefits and Offsets Interview" with Ricciardi on November 7, 2014. During the interview, Ricciardi said that he was receiving $6,000 per month in additional disability benefits from New York Life Insurance. (*Id.* at CF-000807.) Nancy Reese ("Reese"), a long-term disability claims specialist with MetLife, verified that the supplemental policy was "not an offset [to Eligible Pay] per the plan." (*Id.* at CF-000809.) The record does not reveal what, if any, questions were asked about Ricciardi's earnings at Morgan Stanley. Ricciardi was receiving more than twice as much in monthly disability benefits from an insurance policy as Morgan Stanley said he was earning, but it does not appear that this rang any alarm bells at MetLife.

On November 11, 2014, Ricciardi submitted additional information related to his request for LTD benefits. (*Id.* at CF-000325.) On this form, Ricciardi reported that he was receiving $3,000 per month from New York Life Insurance as of September 2014 – less than what he

5

originally said, but still approximately the amount of the Ricciardi's monthly BEE as conveyed by Morgan Stanley to MetLife. (*Id.*)

MetLife approved Ricciardi's LTD request via letter dated November 17, 2014. (*Id.* at CF-000295.) In this letter, Reese informed Ricciardi that he was "entitled to receive 60% of [his] predisability earnings," and explained that his exact benefits were "calculated by multiplying 60% of [his] earnings of $2,877.27 per month resulting in a gross amount of $1,726.36" per month. (*Id.* at CF-000296.) Ricciardi's LTD benefit of $1,726.36 per month became effective on November 28, 2014. (*Id.*)

## III.    Ricciardi's Appeals to MetLife

### A.    Ricciardi's First Request for Review

Needless to say, no financial adviser at an investment bank like Morgan Stanley makes just $2,800 a month. So Ricciardi sought review of MetLife's determination.

On January 5, 2015, Ricciardi contacted MetLife to appeal the $1,726.36 monthly LTD benefit determination. (Defs.' 56.1 ¶ 16; Broadwater Aff. Ex. C at CF-000833.) Stephanie McKinney, the LTD claims specialist who spoke with Ricciardi, wrote in her notes that Ricciardi had called to "ask about appealing his [benefits] amount." (*Id.* at CF-000833.) She provided Ricciardi with MetLife's fax number and "advised that he should send a fax noting he wanted to appeal." (*Id.* at CF-000833–834.)

Ricciardi called MetLife on February 6, 2015 to ask for the fax number again. (*Id.* at CF-000849.)

It seems that he did not send the fax indicating that he wanted to appeal after either of these two calls.

6

But Ricciardi called MetLife again on February 17, 2015, to dispute his benefits calculation. He spoke with Reese, who advised him to contact the human resources department at Morgan Stanley to discuss his salary amount. (*Id.* at CF-000849–850.)

That same day, Ricciardi sent a letter via email to MetLife, challenging the LTD benefits calculation. (*Id.* at CF-000263.) MetLife treated this letter as an appeal of the benefits determination.

In his appeal letter, Ricciardi wrote that the BEE calculation was too low. He asserted that "the calculation for benefits should be the average of the last 12 months of BEE prior to disability (6/1/13-6/1/14)." (*Id.*) He explained that he had "spoken with Eric at AON Hewitt, the company that calculates BEEs for Morgan Stanley, as per the benefits center," and that Eric had advised that Ricciardi's "2013 BEE is $395,805." Ricciardi wrote:

> My average BEE commencing 6/1/13-12/31/13 is $33,000 per month x 7 months or $230,886. My BEE of $34,527 for 2014 prorated for 5 months prior to the disability period, is $2,877 per month or $14,386. To recapitulate, taking BEE average for the past 12 months prior to my disability you get a total of $230,886 plus $14,386 for a total of $245,272. Using the 60% figure for disability, I am owed $147,163 per year or $12,264 per month.

(*Id.*) Ricciardi asked that MetLife recalculate the LTD benefit amount and mail him the difference. (*Id.*) He also told MetLife to call him if they needed additional information. (*Id.*).

Ricciardi appears to have been incorrectly told that his 2013 BEE was to be calculated in the matter set out in his appeal letter; and if the number came from AON Hewitt, then AON Hewitt was wrong as well. The terms of the Plan called for a BEE the greater of his annualized base pay on the date of the most recent annual enrollment (sometime in the fall of 2013) or his W-2 income, less certain specific deductions, for the "previous year" – that is, the calendar year prior to the date when the BEE was calculated (which, since his most recent BEE was calculated

7

in the fall of 2013, meant his 2012 W-2 income less deductions). Therefore, MetLife was perfectly justified in ignoring calculation.

Nonetheless, in response to Ricciardi's letter of February 17, 2015, MetLife reached out to Morgan Stanley, which confirmed in writing that Ricciardi's BEE was $34,527.20. (*Id.* at CF-000220.) The letter did nothing more than confirm the number; it did not explain how Morgan Stanley calculated that number. There is no indication in the record that MetLife asked Morgan Stanley for any additional documentation or explanation.

On February 23, 2015, during a call with a MetLife LTD Claims Specialist, Ricciardi said that he would send in additional information with his payment amount. (*Id.* at CF-000858). Nothing in the record suggests that Ricciardi ever submitted this additional documentation.

On March 6, 2015, MetLife informed Ricciardi that his LTD benefit would not be adjusted because Morgan Stanley confirmed that the BEE was correct. (*Id.* at CF-000235.) The letter said, "Based on the recent review with Morgan Stanley in regard to your [BEE] of $34,527.20, MetLife has been advised that the above noted amount is correct. Accordingly, there will not be an adjustment made to your [BEE] on your LTD claim." (*Id.*)

MetLife's letter to Ricciardi indicates that MetLife relied entirely on Morgan Stanley for the calculation of BEE; it did nothing to make any independent calculation of the amount of Ricciardi's BEE, or to confirm that Morgan Stanley's calculation was correct in accordance with the terms of the Plan.

## B. Ricciardi Appeals MetLife's Decision

On March 13, 2015, Ricciardi sent another letter to MetLife, restating his position that the BEE calculation was "not correct." (*Id.* at CF-000231; *id.* at CF-000917). This letter was treated as an appeal. (*Id.* at CF-000868.)

8

Ricciardi contended that MetLife's calculation was "not correct" according to the guidelines for the calculation of BEE that he had received from Human Resources at Morgan Stanley. (*Id.* at CF-000231.) Ricciardi wrote, "Based upon Morgan Stanley's own guidelines as stated in my letter dated 2/17/15, my benefits should be calculated on the GREATER of the 2013 and 2014 BEE. Since my BEE in 2013 was $395,805, that is the number used to calculate the 60% monthly LTD as of November 28, 2014." (*Id.*)

Again, Ricciardi misinterpreted the terms of the Plan, which states that the BEE is the greater of annualized base pay or your prior year's eligible pay – *not* the greater of the BEE in the year in which an employee becomes disabled and the BEE in the preceding calendar year.

During a phone call on March 23, 2015, Reese informed Ricciardi that Christine Lucchesi ("Lucchesi"), a MetLife appeals specialist, would be handling the appeal. (*Id.*) Reese asked Ricciardi if he wanted to submit any additional information for his appeal; Ricciardi said no "unless the appeal specialist needed W2s." (*Id.* at CF-000872). Obviously, W-2s *were* needed to asses whether the BEE had been calculated correctly, but there is no indication in the record that MetLife took Ricciardi up on his offer to supply them.

Lucchesi interviewed Ricciardi in connection with his appeal on March 27, 2015. (*Id.* at CF-000887.) Ricciardi told her that he had sent in all his information and asked that MetLife reach out to him if it needed any additional information before making a decision. (*Id.*). He also said that he wanted to submit six pages he had received from Morgan Stanley about his BEE, but he was not sure if he could do so because the information might be confidential. Lucchesi told Ricciardi that it was likely fine for him to submit the document, because it was for his use. (*Id.* at CF-000888.) However, there is no document meeting this description in the administrative record.

9

Lucchesi reached out to her colleague at MetLife, who forwarded Morgan Stanley's

written confirmation that $34,527.20 was the correct BEE number. (*Id.* at CF-000220.)

On April 13, 2015, MetLife upheld the benefits amount and denied Ricciardi's appeal of

its initial decision. (*Id.* at CF-000209.) MetLife wrote:

> Your employer's Human Resources department confirmed on February 27, 2015 that your BEE for 2014 was $34,527.20 and that was the LTD amount. You also indicated in your appeal that you were not disputing the BEE for 2014. You have not provided or submitted any information that alters your employer's report of your BEE of $34,527.20 for 2014.
>
> Benefits must be administered in accordance to your employer's Plan, which states Predisability Earnings means your [BEE] in effect just prior to the date of your disability adjusted on the first anniversary of benefit payments and each following anniversary. Therefore, the BEE that was in effect just prior to your date of disability of May 30, 2014 was $34,527.20 yearly. Based on our appeal review, we have determined that the BEE on your claim is correct.

(*Id.* at CF-000211.) Again, there is no indication, either in this letter or in the administrative

record, that MetLife performed any independent calculation of Ricciardi's BEE – or that it was

given the data that would have allowed it to do so. MetLife specifically stated that benefits had

to be administered according to the Plan, but expressed no comprehension of what BEE was or

how it was calculated. Nothing in the record suggests that MetLife ever read, let alone

interpreted, the terms of the Plan that described how to calculate BEE.

Lucchesi was correct about one thing: while under a mistaken understanding about the

terms of the Plan, Ricciardi had indeed indicated that he agreed that this calendar year 2014 BEE

was $34,527. (*See Id.* at CF-000263.). Unfortunately, Ricciardi's statement only added to the

confusion about the amount of benefits he was due – since under the Plan's terms his "2014

BEE" as he was referring to it, would have been based on his 2014 salary and calculated in the

fall of 2014 – and was irrelevant.

10

MetLife advised Ricciardi that he had exhausted his administrative rights and that it would not consider another appeal. (*Id.*)

## C. Ricciardi's Second Appeal

On April 17, 2015, Lucchesi spoke to Ricciardi on the phone. (Ricciardi had not yet received the April 13 letter described above). Ricciardi asked Lucchese if Morgan Stanley had given MetLife the "secure statement" that Ricciardi believed he could not give on his own. Lucchesi said it had not. (*Id.* at CF-000922.) Lucchesi said that "as a courtesy," if Riccardi had additional information that might show an error in calculating the BEE, she would review the information with her Unit Leader, even though Ricciardi's administrative rights had been exhausted. (*Id.* at CF-000923.) There is no evidence that MetLife reached out to Morgan Stanley to inquire about this statement.

On April 23, 2015, Ricciardi sent a third letter to MetLife. He attached copies of his 2013 and 2014 W-2s (the ones he mistakenly thought were relevant), which reported W-2 wages of $196,888.76 and $197,377.28, respectively. (*Id.* at CF-000182–000186.) In this letter, Ricciardi said that Lucchesi's "statement that I am not disputing the BEE for 2014 is not accurate." He said that he believed his BEE "number to be used should be a BEE of $295,805." He further explained:

> A review of my 2013 and 2014 W-2 reported to the Federal Government reveals that my wages, tips or other compensation revealed on line 1 was $196,888.76 and $197,377.28 respectively. It seems obvious that the 2014 calculation, which is a reduction by over 90% of the 2013 number on similar gross salary is incorrect.

(*Id.* at CF-000185.) Ricciardi asked that "Morgan Stanley, AON Hewitt, or . . . MetLife provide an explanation of th[e] gross difference in the computation of the 2013 and 2014 BEE." (*Id.* at CF-000186.)

This communication finally seems to have set off alarm bells at MetLife. On May 4, 2015, Lucchesi reached out to AON Hewitt via e-mail and asked for information concerning the discrepancy between the BEE for 2014 provided by Morgan Stanley of $34,527 and Ricciardi's 2013 and 2014 wages. (*Id.* at CF-000180.)

On May 6, 2015, Lucchesi sent a letter to Ricciardi, informing him that he could reach out to Morgan Stanley for copies of Plan documents, and that concerns in his letter regarding his BEE would be addressed "under separate cover." (*Id.* at CF-000179.) MetLife – which had discretion under the Plan to interpret its terms – did not indicate that it had the slightest comprehension of what the Plan provided.

On May 7, 2015 and again on May 12, 2015, Lucchesi sent a follow-up e-mail to AON Hewitt asking for an update. (*Id.* at CF-000173–175.) AON Hewitt never responded.

On May 15, 2015, Ricciardi wrote to Lucchesi, citing language from the Morgan Stanley Plan describing the BEE calculation and saying that "is not disputed that my BEE (Benefits Eligible Earnings) for 2013 was $395,805" and that MetLife "must use the 2013 BEE calculated for the following year of 2014" because he was first disabled on May 30, 2014. (*Id.* at CF-000157–158.) He provided no new evidence supporting his statement that his BEE for 2013 was $395,805, and nothing to indicate that this was "not disputed."

By May 21, 2015, MetLife still had received no response from AON Hewitt. Lucchesi decided that she would "allow an additional week" for them to respond. (*Id.* at CF-000966.) As of May 29, 2015, over a week later, there was still no response. Lucchesi sent additional follow-up requests on June 5, 2015 and on June 15, 2015. AON Hewitt – for reasons unknown – remained mute.

12

On June 18, 2015, despite having failed to obtain any information from AON Hewitt,

MetLife advised Ricciardi that the April 13, 2015 determination was its final determination. (*Id.*

at CF-000145.) It said: "We reviewed your letter; however we again confirmed with Morgan

Stanley your benefit for long term disability was correct." (*Id.*) The language "we again

confirmed with Morgan Stanley" suggests that all MetLife did was ask Morgan Stanley what the

BEE should be; it performed no independent calculation of what the BEE should be under the

terms of the Plan.

MetLife told Ricciardi that he had exhausted his administrative remedies. (*Id.* at CF-

000145.)

On May 22, 2016, Ricciardi filed a claim in this Court pursuant to ERISA challenging

Defendants' benefits determination. Defendants have filed a Motion for Summary Judgment

asking that the Court dismiss with prejudice Ricciardi's claim that Defendants incorrectly

calculated his BEE and LTD benefits. (Dkt. No. 23.) The Parties agree that Ricciardi exhausted

his administrative remedies under the Plan (*i.e.*, appealing his benefits determination through

MetLife) and that he timely filed in federal court. (*See* Answer and Affirmative Defenses of

Metropolitan Life Insurance Company, Morgan Stanley Disability Plan and Morgan Stanley &

Co., LLC to the Compl. of Vincent Ricciardi ¶ 26, Dkt. No. 14; Broadwater Aff. Ex. C at CF-

000145.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is granted where all submissions, taken together, show there is "no

genuine dispute as to any material fact" and that the moving party is "entitled to a judgment as a

13

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–23. A fact is considered "material" if it "affect[s] the outcome of the suit under the governing law," and there is a "genuine issue" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the burden of proof at trial would fall on the moving party, its "submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). On the other hand, if the burden of proof would fall on the nonmoving party, it is sufficient for the party to show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322; *see also Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). If the moving party meets its burden, the nonmoving party must then "set out specific facts showing a genuine issue for trial" to avoid summary judgment. *Anderson*, 477 U.S. at 248.

The court views the evidence in the light most favorable to the nonmoving party. *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016). To raise a genuine issue of material fact, the nonmoving party's evidence must be more than "mere allegations or denials" and must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481,

14

496 (S.D.N.Y. 2015) (quoting *Senno v. Elmsford Union Free Sch. Dist.*, 821 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011)).

## II.    ERISA Standard of Review

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, provides that a person denied benefits under an employee benefits plan may challenge that denial in federal court. *See* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). To proceed with a claim in federal court, a party must first exhaust administrative remedies. *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993). Exhaustion consists of "only those administrative appeals provided for in the relevant plan or policy." *Id.*

In ERISA motions where a plaintiff challenges the denial of benefits, courts generally "treat the parties' submissions as cross-motions for summary judgment." *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 672 (S.D.N.Y. 2011). A summary judgment motion is a "vehicle whereby the Court can apply substantive ERISA law to the administrative record." *S.M.*, 94 F. Supp. 3d at 497 (quoting *Gannon v. Aetna Life Ins. Co.*, No. 05-CV-2160 (JGK), 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007)). ERISA itself "does not set out the applicable standard of review for actions challenging benefit eligibility determinations." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F. 3d 46, 49 (2d Cir. 1996)). "Substantive ERISA law determines the proper standard of review that the Court should apply in reviewing the decision of the plan administrator, as well as whether the Court can consider materials beyond the administrative record." *Gannon v. Aetna Life Ins. Co.*, No. 05-CV-2160 (JGK), 2007 WL 2844869, at *6

15

(S.D.N.Y. Sept. 28, 2007). The Supreme Court has held that "denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Fay*, 297 F. 3d at 103 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

## A. Discretionary Authority and the Arbitrary and Capricious Standard

Where a plan grants the administrator discretionary authority to determine eligibility benefits, the court may use a deferential standard of review. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). Courts have found that the plan language "need not actually use the words 'discretion' or 'deference' to be effective, but it must be clear . . . language that establishes an objective standard does not reserve discretion, while language that establishes a subjective standard does." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (quoting *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005)). The administrator "bears the burden of proving that the arbitrary and capricious standard of review applies." *S.M.*, 94 F. Supp. 3d at 497.

When deference applies, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)); *see also Firestone*, 489 U.S. at 115. An administrator's decision is arbitrary and capricious when it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley*, 551 F.3d at 132 (quoting *Pagan*, 52 F.3d at 442). Courts have defined "substantial evidence" as "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator"; substantial evidence "requires more than a scintilla but

16

less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003)); *see also Sandoval v. Aetna Life and Casualty Ins. Co.,* 967 F.2d 377, 382 (2d Cir.1995).

Plan administrators "may exercise their discretion in determining whether a claimant's evidence is sufficient to support his claim." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015). If the record is underdeveloped, administrators may have to make a "reasonable effort" to further develop the record. *Id.* at 313. But administrators are not required to "scour the countryside in search of evidence to bolster a petitioner's case." *Id.* (quoting *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014)). In cases where "both the plan administrator and . . . claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley*, 551 3d at 132 (quoting *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92-93 (2d Cir. 2000)).

## B. Conflict of Interest

A conflict of interest may preclude or limit deferential review. A conflict of interest may exist when the "entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 108 (2008).

When there is a demonstrated conflict of interest, the court makes the following "pertinent" inquiries: (1) "whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan" and (2) whether "the evidence shows that the administrator was in fact influenced by such conflict." *McCauley,* 551 F.3d at 130 (quoting *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1255–56 (2d Cir. 1996)). "If the court

17

finds that the administrator was in fact influenced by the conflict of interest, the deference

otherwise accorded the administrator's decision drops away and the court interprets the plan *de

novo.*" *Id.* (quoting *Sullivan*, 82 F.3d at 1256). However, a possible conflict will not alter the

standard of review where the plaintiff has not explained how the conflict impacted the

"reasonableness" of the administrator's decision. *McCauley*, 551 F.3d at 130.

## III. The Merits.

There are several issues, including especially structural conflict of interest, that this Court

could discuss at length as part of disposing of this Motion. However, it behooves me – for many

reasons, but principally because this case has been pending for an unconscionable length of time[3]

– to go directly to the bottom line.

Defendants' Motion for Summary Judgment must be denied, and this matter remanded

for full findings of fact, because it could not be more clear, from the deficient administrative

record, that MetLife's determination was made in an arbitrary and capricious manner. Indeed,

MetLife rests its motion on something that may well turn out to be dispositive, but that is

nowhere mentioned in the administrative record and that was never communicated to Plaintiff in

connection with any of his multiple appeals. That alone provides this Court with good reason to

send this matter back for the sort of review that MetLife should have – but did not – give to the

Plaintiff's appeals before denying them.

### A. The Arbitrary and Capricious Standard Applies.

The Court reviews Ricciardi's claim using the arbitrary and capricious standard.

---

[3] This motion has been pending for a very long time. The judge originally assigned to the matter died while the motion was pending, and the Clerk of Court made an administrative error and removed the motion from the docket. I apologize to all parties; as soon as we found the motion we turned to it.

The Plan clearly provides MetLife with discretionary authority under *Firestone Tire & Rubber Co. v. Bruch. See* 489 U.S. 101 at 115. The Plan says: "The administrators and fiduciaries of Morgan Stanley's benefit plans, including the Reviewers, have discretionary authority to interpret and make determinations under the Plans. Any decision made will be effective unless the review is found to be arbitrary or capricious." (*Id.* Ex. A at SPD-000163.) Courts have found similar language to warrant deferential review. *See, e.g.*, *Zarringhalam v. United Food & Commercial Workers Int'l Union Local 1500 Welfare Fund*, 906 F. Supp. 2d 140, 156 (E.D.N.Y. 2012); *Solomon v. Metro. Life Ins. Co.*, 628 F. Supp. 2d 519, 527 (S.D.N.Y. 2009); *see also Stolarik v. N. Y. Times Co.*, 323 F. Supp. 3d 523, 541 (S.D.N.Y. 2018).

Ricciardi does not dispute that the arbitrary and capricious standard applies. (*See* Pl. Br. at 8.) The only issue is whether MetLife exercised the authority it was given, so as to justify *Firestone* deference. It did not.

## B. The Administrative Record Suggests that MetLife Acted Arbitrarily and Capriciously.

Nothing in this record makes any sense.

No one who works at Morgan Stanley, or any other investment bank, in a position like Plaintiff's makes just over $34,000 a year – unless he is very bad at what he does (in which case, he would cease to be employed).

But a great many people at Morgan Stanley, and similar firms, work for a very small amount of base pay plus either commissions or a bonus or both – generally in amounts that are many, many multiples of base pay. This is why BEE is calculated as *the greater of* an employee's base pay (a largely irrelevant number) or his W-2 income for the prior calendar year,

19

less certain specified deductions. That formula reflects a truth universally acknowledged: base pay is a rounding error for employees of a financial services firm like Morgan Stanley.

Everyone knows that.

So a sophisticated benefit manger like MetLife knows it too – or should.

As a result, a representation that a highly paid employee in the financial services sector has a very low BEE should set off alarm bells for the Reviewer – especially where the Plan provides for a comparative calculation between a number that is always low and one that is often high.

Yet it is undisputed that MetLife never performed its own calculation of the BEE. It simply relied on what Morgan Stanley told it – a number that seems on its face ridiculously low, and wildly at variance with Ricciardi's W-2 income in 2013 (the last full year during which he worked) of $196,888.76. For that matter, Ricciardi's W-2 income for 2014 – a year in which he worked for only five months – was $197,377.92. Both of those W-2s are in the administrative record.

Yet nowhere in the administrative records is there any document or communication showing how Morgan Stanley calculated Ricciardi's seemingly low BEE. There is no indication at all that MetLife ever confronted anyone at Morgan Stanley with the W-2s and said, "What gives here?" There is no indication that anyone at MetLife went back to the Plan language and said, "OK, Morgan Stanley, what is that $34,527.20 number? His base pay? His W-2 income in the relevant year less deduction? If the latter, what is his base pay? And were there more deductions? What is the comparator number?" Nor did MetLife pursue AON Hewitt, Morgan Stanley's benefits consultant, until it got a clear answer to those questions.

ERISA requires that the plan administrator provide a "full and fair review" of the decision to deny the claim. *See, e.g., Firestone*, 489 U.S. at 113; *see also* 29 U.S.C. § 1133(2). This includes considering "any and all pertinent information reasonably available to [it]." *Neely v. Pension Tr. Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00 CV 2013 (SJ), 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004) (citing *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813,* 715 F.2d 853 (3d Cir. 1983)). As the Second Circuit has observed, "Under certain circumstances, it may be arbitrary and capricious for the administrator to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further." *Roganti*, 785 F.3d at 213. The administrator cannot be "willfully blind" to information that might provide clarification when evidence suggests there may be a legitimate claim. *Harrison,* 773 F.3d at 21.

By the time Ricciardi reached his third appeal and submitted his W-2 forms, MetLife was clearly alerted to the discrepancy between Ricciardi's W-2 income – which is his presumptive Eligible Pay under the Plan – and his wildly lower BEE. All MetLife needed to do was to obtain some basic information or an explanation. MetLife understood this; it reached out to AON Hewitt because it had information suggesting that the BEE might be incorrect. But when it did not obtain any explanation from AON Hewitt, it did not pursue the issue; it simply relied only on Morgan Stanley's unexplained and unjustified representation about Ricciardi's BEE. And when it advised Ricciardi about why his appeal was being denied, all it said was it "confirmed with Morgan Stanley" that the BEE was correct. (*See* Broadwater Aff. at CF-000145.) It did not interpret or explain any relevant Plan provision (which is important since Ricciardi has purported to interpret the Plan); it did not obtain the data needed to perform a BEE calculation itself.

21

This is enough to convince the Court that MetLife acted arbitrarily and capriciously in reviewing Ricciardi's LTD benefit. The fact that the administrative record is so deficient – Ricciardi's relevant (2012) W-2 is not there; neither is there any explanation of what Ricciardi's base salary was for 2013, or how Morgan Stanley concluded that $34,527.20 was the correct BEE – strongly supports just such a conclusion.

The matter then becomes more complicated when one considers the papers MetLife filed in support of its Motion for Summary Judgment. In its brief, MetLife argues that its conclusion is not arbitrary or capricious because, "Ricciardi is seeking to increase his BEE by including as Eligible Pay a bonus to satisfy a loan, which is explicitly excluded by the Plan's provisions setting forth what is included in calculating Eligible Pay." (Legal Mem. In Opp. to Defs.' Metropolitan Life Insurance Company, the Morgan Stanley Disability Plan and Morgan Stanley & Co., LLC Mot. for Summ. J. ("Pl. Br.") at 1, Dkt. No. 28.) One looks in vain in the administrative record for support for this statement. Nothing in the administrative record indicates that: (1) Ricciardi had any sort of loan (there is no such evidence); (2) Morgan Stanley calculated Ricciardi's BEE by making a deduction for loan repayments (we have no idea how Morgan Stanley calculated Ricciardi's BEE); or (3) MetLife ever advised Ricciardi that the reason it was denying his appeal was that his BEE was unexpectedly low due to the existence of a loan that he needed to repay (indeed, there is no evidence that MetLife ever looked at the BEE formula or asked Morgan Stanley to justify its conclusion, which the Reviewer simply adopted wholesale).

This Court has looked, over and over again, at the formula for calculating BEE. It is absolutely true "certain" bonuses that were given to employees so they could pay off loans have to be deducted from W-2 income when calculating BEE. (*See* Broadwater Aff. Ex. A. at SPD-

22

000011.) If that were indeed MetLife's reason for denying Ricciardi's appeals and if indeed Ricciardi had a loan, this provision affords an obvious explanation for the massive discrepancy between Ricciardi's W-2 income and his BEE – so obvious that one would think this reason would have been cited by MetLife when it denied his appeals. It was not. All that MetLife ever said was that it had checked with Morgan Stanley, and Morgan Stanley insisted that his BEE was $34,527.20 – ergo, it must be so. Even when MetLife suspected that something might be amiss, and reached out to AON Hewitt for an explanation of why the BEE was so low, it ultimately came back to "Morgan Stanley told me so" as the one and only stated justification for denying Ricciardi's appeals.

"When determining whether there is an issue of material fact as to whether an administrator's denial of benefits was arbitrary and capricious, courts look to the reasons provided by the administrator *at the time of the denial*." *Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223 (D. Conn. 2018) (emphasis added); *see also Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, 1 F. Supp. 3d 72, 93 (W.D.N.Y.), *aff'd*, 594 F. App'x 696 (2d Cir. 2014). "Post hoc rationalization" is insufficient. *Meidl*, 346 F. Supp at 223. There can be no question that this "loan repayment" argument is a post hoc rationalization, one first raised in the context of this litigation. The fact that MetLife is now relying on an entirely new explanation for its behavior – one that was never communicated to Plaintiff during the appeals process – reinforces the Court's conclusion that MetLife acted in an arbitrary and capricious manner in denying Ricciardi's appeals. The fact that we can locate nothing whatsoever in the administrative record that would support this ground for decision only makes matters worse.

23

I could stop there. But this case just gets "curiouser and curiouser."[4]

MetLife's sudden and unexpected invocation of some sort of loan repayment to justify its decision has called forth an equally unexpected response from Ricciardi. He has responded to MetLife's factually unsupported and legally irrelevant argument with a profusion of evidence that is not contained in the administrative record. (*See* Affidavit of Vincent Ricciardi in Supp. of Opp. to Mot. for Summ. J. ("Ricciardi Aff."), Dkt No. 30.)

Generally, the district court does not consider evidence from outside of the administrative record. "When reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim." *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.,* 819 F.3d 42, 60 (2d Cir. 2016).

However, "The decision whether to consider evidence from outside the administrative record is within the discretion of the district court." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003). In particular, the court may admit additional evidence when there is "good cause" to do so. *Halo,* 819 F.3d at 60. One thing that gives rise to "good cause" for considering *dehors* the record evidence is the fact that an insurer's claimed reason for denying a claim was not stated in notices to the claimant. *Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 658-59 (S.D.N.Y. 2011); *see also Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 288 (2d Cir. 2000). Since it is beyond cavil that MetLife never told Ricciardi that it was denying his appeal because income on which he was relying included a "bonus to satisfy a loan," I have "good cause" to consider Ricciardi's additional

---

[4] Lewis Carroll, Alice's Adventures in Wonderland, 15 (1st ed. 1869).

evidence – evidence that I assume he would have sent to MetLife had he known MetLife was considering whether loan repayment was deflating his BEE.

Given the nature of Ricciardi's evidence, I cannot possibly ignore it, since most of it is anything but favorable to Ricciardi. It includes his W-2 for the calendar year 2012 – the relevant W-2 for purposes of calculating his BEE as of the fall of 2013 – which shows his W-2 income to be $206,003.89. That number is slightly higher than, and totally consistent with, his 2013 earnings – and more than six times greater than the $34,520.20 that Morgan Stanley claims is Ricciardi's 2013 BEE.

But it also includes evidence about a massive loan, in the amount of $1,466,000, that Morgan Stanley floated Ricciardi when he came on board in December 2011. Ricciardi provided the Court with a Promissory Note and admits that he was expected to repay that loan in yearly payments of $164,111.11 (plus interest) over nine years. (*Id.* Ex. A.) Moreover, he represents that he was expected to make those payments "......*by way of yearly bonuses to be paid to me over that nine year period* pursuant to my employment with Morgan Stanley." (*Id.* at ¶ 3) (emphasis added.) A Bonus Agreement was supposedly structured to "provide the future funds to repay the loan." (*Id.*) The Bonus Agreement was not included in the new material submitted by Ricciardi in response to MetLife's motion.

An annotated copy of the Promissory Note submitted by Ricciardi indicates that he made his first payment toward the loan on December 2, 2012. (*Id.* Ex. A.) But one cannot tell, from his 2012 W-2, whether Ricciardi's total pay for 2012, minus his bonus he received loan payment, was $41,892,[5] or whether the W-2 income shown on Ricciardi's 2012 W-2 is exclusive of the

---

[5] Which is more than $34,527.20.

25

loan-repayment bonus. It is, I suppose, possible that Ricciardi got a bonus greater than the amount of his annual loan repayment, or perhaps he earned commissions, as many stockbrokers do. (*Id.*) But it is also quite possible that the W-2 reflects the loan repayment. Morgan Stanley certainly knows the answer to that question, though MetLife plainly does not (or did not at the time it denied the appeals).

From this new information, one might guess that Ricciardi's BEE as calculated in the fall of 2013 was in fact very low because a great deal of his W-2 income was properly excludable from the calculation of Eligible Pay. And if there were any indication in the administrative record that MetLife ever (1) obtained information about Ricciardi's loan from Morgan Stanley; (2) looked at the relevant language in the Policy and interpreted the phrase "certain bonuses to repay a loan" to cover whatever bonus was paid to Ricciardi in 2012 (an interpretation to which the Court would have to give *Firestone* deference, *see Firestone*, 489 U.S. at 115 [6]); and (3) performed even a rudimentary calculation of BEE using the formula in the policy, this Court would be hard-pressed to overturn its denial of Ricciardi's appeals.

But one does not grant a summary judgment motion on the basis of a "guess." And since there is no evidence in the administrative record that MetLife did any of those things, I cannot possibly sustain its determination that Ricciardi's BEE was in fact properly calculated as $34,527.20.

For that reason, Defendants' Motion for Summary Judgment must be denied.

---

[6] This is true even though the use of the word "certain" in the phrase "certain bonuses to satisfy a loan" arguably renders the statement ambiguous, since it could mean that some kinds of bonuses "to satisfy a loan" are properly excludable from Eligible Pay and other such bonuses are not (that is not, of course, the most logical way of defining the phrase).

## IV. Remedy

In an ERISA case reviewed under the arbitrary and capricious standard, "the failure of the plan administrator or fiduciary to prevail on a motion for summary judgment will result either in the entry of judgment for the plaintiff . . . or in a remand to the plan decision maker." *Maida v. Life Ins. Co. of N. Am.*, 949 F. Supp. 1087, 1093 (S.D.N.Y. 1997) (internal citations omitted). If the court cannot find that the Plaintiff's claim "necessarily should have been granted because . . . upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim," the case should be remanded. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073 (2d Cir. 1995); *see also Aitkins ex rel. Casillas v. Park Place Entm't Corp.*, No. 06CV4814JFBMLO, 2008 WL 820040, at *20 (E.D.N.Y. Mar. 25, 2008). Indeed, "The normal procedure for review of ERISA denials that have been found arbitrary and capricious is remand to the fiduciary for a new eligibility determination." *Cook v. New York Times Co. Long-Term Disability Plan*, No. 02 CIV. 9154 (GEL), 2004 WL 203111, at *19 (S.D.N.Y. Jan. 30, 2004). In particular, "Where the administrative record does not contain evidence that the court finds should have been considered, the proper result is remand to the Claim Administrator." *Peterson v. Cont'l Cas. Co.,* 77 F. Supp. 2d 420, 429 (S.D.N.Y. 1999).

Obviously, I cannot enter judgment for Ricciardi. The additional evidence that he placed in the record does not permit it.

So, I am remanding the case. It is time for MetLife to do its job – which is to provide a full and fair review of Plaintiff's claim that his BEE is too low.

Lest MetLife be in any doubt about what is required on remand, let me be clear. MetLife should find out exactly how Morgan Stanley calculated Ricciardi's BEE. It should be certain that this information – all of it – is included in the administrative record.

27

MetLife should review that calculation against the relevant Plan language. If MetLife is required to interpret the Plan language in connection with this exercise, it should do so in a manner that admits of judicial review. Even in light of *Firestone* deference, a court has a job to do.

MetLife must give Plaintiff an opportunity to contest the reasons assigned in support of Morgan Stanley's calculation and notice of what types of information he might provide in order to allow MetLife to give his claim a full and fair review. *Aitkins.,* 2008 WL 820040 at *21. Within 30 days, MetLife should send Ricciardi (or his counsel) a letter that (1) describes the standard MetLife will use to assess Plaintiff's claim, and (2) advises him of what evidence he must provide to meet it.

Plaintiff must then submit to MetLife any additional evidence within 30 days of receipt of such communication from MetLife. If he fails to comply, MetLife will be fully justified in relying on the record as accrued, including the additional information from Morgan Stanley.

Ricciardi's only argument made to this Court appears to be premised on the notion that the nearly $1.5 million dollar loan he was extended by his new employer in December 2011 is a forgivable loan, which he believes, means it cannot be deducted from his W-2 income when calculating Eligible Pay (this I surmise, because Ricciardi does not say very much at all about why the information he provided is helpful to his cause – fortunately for him, presenting that information to the court was premature). While I cannot help but predict that MetLife will be unmoved by this argument, stranger things have happened. In any event, the decision is for MetLife to make in the first instance, not this Court.

Finally, MetLife must then make its decision within 30 days of receipt of Plaintiff's evidence and argument.

28

The Parties should provide the court with the status of the remand 60 days and 120 days after the date of this Order. *See, e.g., Dimopoulou v. First Unum Life Ins. Co.*, 162 F. Supp. 3d 250, 263 (S.D.N.Y. 2016). This case will remain on the Court's docket during the remand; if Plaintiff wishes to challenge MetLife's decision, he should do so by making a motion for summary judgment in this matter, in reliance on the administrative record. There is no need to refile portions of that record that are already on file with the Court; only the additions to the administrative record that result from this remand should be appended to such a motion.

## CONCLUSION

Based on the foregoing, the Court finds that Defendants' Motion for Summary Judgment is DENIED.

The Clerk of Court is respectfully directed to remove Dkt No. 23 from the Court's list of open motions.

Dated: February 15, 2019

_____

Chief Judge

BY ECF TO ALL COUNSEL